UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT (HARTFORD)

| | |
|---|---|
| IN RE:<br><br>STEPHEN W. GOULIS,<br>ELEANOR C. GOULIS,<br>  DEBTORS | BK No.:  16-20246-JJT<br><br><br>Chapter 13 |

WILMINGTON TRUST, NATIONAL
ASSOCIATION, NOT IN ITS INDIVIDUAL
CAPACITY, BUT SOLELY AS TRUSTEE
FOR VM TRUST SERIES 3, A DELAWARE
STATUTORY TRUST, MOVANT

vs.

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
  DEBTORS

&

MOLLY T. WHITON, ESQ., TRUSTEE

RESPONDENTS

MOTION FOR RELIEF FROM AUTOMATIC STAY

TO THE HONORABLE JAMES J. TANCREDI:

Wilmington Trust, National Association, Not in its Individual Capacity, but
Solely as Trustee for VM Trust Series 3, a Delaware Statutory Trust (together with its
successors, affiliates, principals, and assigns, "Movant"), respectfully represents as
follows:

1.     Movant is a business entity with a mailing address: c/o Shellpoint

Mortgage Servicing, P.O. Box 10826-0826, Greenville, SC 29630-0826.

2.     Stephen W. Goulis an individual with a mailing address of  352 Lake Street, Vernon Rockville, CT 06066 and Eleanor C. Goulis is an individual with a mailing address of  352 Lake Street, Vernon Rockville, CT 06066 (together, the "Debtors").

3.     The Debtors are obligors pursuant to promissory note (the "Note") dated May 25, 2006, in an original principal amount of $185,000.00.  A copy of the Note is annexed as Exhibit "A" and incorporated herein by reference.  By virtue of possession of the Note as endorsed in blank, Movant is entitled to enforce the Note.

4.     To secure the Note, the Debtors executed in favor of, and delivered a mortgage to Mortgage Electronic Registration Systems, Inc., solely as nominee for EquiFirst Corporation (the "Mortgage", together with the Note and any other loan documents executed in connection therewith, the "Loan Documents") dated May 25, 2006, securing the Note and encumbering the property located at 352 Lake Street, Vernon Rockville, CT 06066 (the "Property").  A copy of the Mortgage is annexed as Exhibit "B" and incorporated herein by reference.

5.     There is no other collateral to secure the Note.

6.     Movant is the current holder of the Mortgage by virtue of assignments of mortgage, copies of which are annexed as Exhibit "C" and incorporated herein by reference.

7.     On February 19, 2016, the Debtors filed a petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut - Hartford.

8.     As of June 26, 2017, the total amount due and owing pursuant to the Loan Documents was $283,732.58 in principal, accrued interest, late charges, and miscellaneous fees.

9.     The total amount of encumbrances on the Property is approximately $284,014.14, which in addition to the Mortgage, includes the following encumbrances identified in Debtor's Schedule D:

    a.    A scheduled lien to the Town of Vernon in the amount of $281.56.

10.     The Debtors' Schedule D lists the fair market value of the Property as $190,080.00.   A copy of the Debtors' Schedule D is annexed as Exhibit "D" and incorporated herein by reference.

11.     There is a pre-petition arrearage of $53, 226.57 owing to the Movant as set forth in its Proof of Claim filed in this proceeding.

12.     As of June 19, 2017, there is a post-petition payment arrearage owing to Movant in the amount of $16,041.84 (consisting of payments due 09/01/2016-06/01/2017, less a suspense balance of $912.05), exclusive of attorneys' fees, costs, and expenses in connection with the filing of this Motion.

13.     The regular monthly payment due to Movant at this time is $1,734.19.

14.     Movant seeks relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1) for cause on the basis that the Debtors are in default of the payment obligations resulting in an arrearage owing under the Loan Documents.

15.     Movant seeks relief from the automatic stay pursuant to 11 U.S.C. §362(d)(2) as there is no equity in the Property and it is not necessary for an effective reorganization.

WHEREFORE, Movant prays that:

i) it be granted relief from the section 362 automatic stay and the stay imposed by Bankruptcy Rule of Procedure 4001(a)(3) for the purpose of exercising its rights under the Loan Documents and under applicable law, including, without limitation, taking possession of the Property, obtaining a deed-in-lieu of foreclosure, and/or foreclosing the Mortgage and bringing such action, including eviction proceedings, as may be appropriate; and

(ii)  the Court order such other and further relief as may be just and proper.

Dated: <u>July 5, 2017</u>      Wilmington Trust, National Association, Not in its
              Individual Capacity, but Solely as Trustee for VM
              Trust Series 3, a Delaware Statutory Trust,
              By Its Attorney

              <u>/s/ Jeffrey J. Hardiman</u>
              Jeffrey J. Hardiman, Esq.
              Bar #24355
              Shechtman Halperin Savage, LLP
              1080 Main Street
              Pawtucket, RI 02860
              (401) 272-1400 phone
              (401) 272-1403 fax
              jhardiman@shslawfirm.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT (HARTFORD)

IN RE:

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
  DEBTORS

BK No.:  16-20246-JJT

Chapter 13

WILMINGTON TRUST, NATIONAL
ASSOCIATION, NOT IN ITS INDIVIDUAL
CAPACITY, BUT SOLELY AS TRUSTEE
FOR VM TRUST SERIES 3, A DELAWARE
STATUTORY TRUST, MOVANT

vs.

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
  DEBTORS

&

MOLLY T. WHITON, ESQ., TRUSTEE

RESPONDENTS

SUPPLEMENTAL DECLARATION IN SUPPORT OF
MOTION FOR RELIEF FROM AUTOMATIC STAY

I, __Barbara Lebiedziewicz_____, declare under penalty of perjury as follows:

   1.    I am a/an __Bankruptcy Case Manager____ of Shellpoint Mortgage Servicing,

("Shellpoint") and am authorized to sign this supplemental declaration on behalf of Shellpoint as

servicing agent for Wilmington Trust, National Association, Not in its Individual Capacity, but

Solely as Trustee for VM Trust Series 3, a Delaware Statutory Trust. This supplemental

declaration is provided in support of the Motion for Relief from Stay (the "Motion") filed

contemporaneously herewith.

2.       As part of my job responsibilities for Shellpoint, I have personal knowledge of and am familiar with the types of records maintained by Shellpoint in connection with the loan that is the subject of the Motion (the "Loan") and the procedures for creating those types of records.   I have access to and have reviewed the books, records and files of Shellpoint that pertain to the Loan and extensions of credit given to the Debtors concerning the property securing such Loan.

3.       The information in this declaration is taken from Shellpoint's business records regarding the Loan.   The records are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of Shellpoint's regularly conducted business activities; and (c) it is the regular practice of Shellpoint to make such records.

4.       The Debtors, Stephen W. Goulis and Eleanor C. Goulis, have executed and/or delivered and/or are otherwise obligated with respect to that certain promissory note referenced in the Motion (the "Note").   Pursuant to that certain mortgage referenced in the Motion (the "Mortgage"), all obligations of the Debtors under and with respect to the Note and the Mortgage are secured by the property referenced in the Motion.

5.       As of June 19, 2017, there are one or more defaults in paying post-petition amounts due with respect to the Note.

6.       As of June 26, 2017, the unpaid principal balance of the Note is $230,098.36.

7.       The Debtor's Schedule D lists the fair market value of the Property as $190,080.00.

8.    The following chart sets forth those postpetition payments, due pursuant to the terms of the Note that have been missed by the Debtor as of June 19, 2017:

| Number of Missed Payments | From | To | Monthly Payment Amount | Total Amounts Missed |
|---|---|---|---|---|
| 7 | 09/01/2016 | 03/01/2017 | $1,678.76 | $11,751.32 |
| 3 | 04/01/2017 | 06/01/2017 | $1,734.19 | $5,202.57 |
| Less Suspense Balance: | | | | ($912.05) |

**Total: $16,041.84**

9.    As of June 19, 2017, the total postpetition arrearage/delinquency is $16.041.84. This is the amount necessary to cure any post-petition default on or about the date hereof.

10.    The next payment under the terms of the Note will come due on July 1, 2017 and is in the amount of $1,734.19.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed this 3rd__ day of ____July_____, 2017.

Name:  Barbara Lebiedziewicz
Title:   Bankruptcy Case Manager

## LIMITED POWER OF ATTORNEY

VM TRUST SERIES 3 ("Grantor") has engaged New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") to service a portfolio(s) of loans on Grantor's behalf (the "Assets") pursuant to that certain Servicing Agreement dated as of October 2, 2014 between Grantor and Shellpoint (the "Agreement"). Grantor provides this Limited Power of Attorney to Shellpoint to give Shellpoint the authority to service the Assets.

Now, therefore, Grantor does hereby constitute and appoint Shellpoint the true and lawful attorney-in-fact of Grantor and in Grantor's name, place and stead for the following purposes:

a. receive, endorse and collect all checks or other instruments and satisfactions of Mortgage Loan or other security instruments;

b. executing any to assign or endorse any Mortgage, deed of trust, promissory note or other instrument related to the Mortgage Loans;

c. correct any assignment, mortgage, deed of trust or promissory note or other instrument related to the Mortgage Loans;

d. complete and execute lost note affidavits or other lost document affidavits related to the Mortgage Loans;

e. issue title requests and instructions related to the Mortgage Loans;

f. declare defaults with respect to a Mortgage Loan or Mortgaged Property;

g. give notices of intention to accelerate and of acceleration and of any notice as reasonably necessary or appropriate;

h. post all notices as required by law and the Mortgage Loan Documents, including the debt instruments and the instruments securing a Mortgage Loan in order to foreclose or otherwise enforce the security instruments;

i. [reserved]

j. conduct eviction or similar dispossessory proceedings;

k. take possession of collateral on behalf of Client;

l. execute any documents or instruments necessary for the offer, listing, closing of sale, and conveyance of Mortgaged Property by foreclosure or other process, including but not limited to grant, warranty, quit claim and statutory deeds or similar instruments of conveyance;

m. execute any documents or instruments in connection with any bankruptcy or receivership of an obligor or mortgagor on a Mortgage Loan;

n. file suit and prosecute legal actions against all parties liable for amounts due under a Mortgage Loan, including but not limited to, any deficiency amounts due following foreclosure or other acquisition or disposition of Mortgaged Property;

o. execute all necessary documents to file claims with insurers on behalf of Client;

p. [reserved]; and

q. take such other actions and exercise such rights which may be taken by Client with respect to any Mortgaged Property, including but not limited to, realization upon all or any part of a Mortgage Loan or any collateral therefor or guaranty thereof.

Grantor further grants to Shellpoint as its attorney-in-fact full authority to act in any manner both proper and necessary to exercise the foregoing powers, and ratifies every act that Shellpoint may lawfully perform in exercising those powers by virtue thereof.

This Limited Power of Attorney shall be effective as of the date executed below (the "Effective Date)."

The Grantor may revoke this Limited Power of Attorney.

This Limited Power of Attorney shall expire upon the earlier of (i) two (2) years from the Effective Date, or (ii) upon being revoked by the Grantor.

IN WITNESS THEREOF, Grantor has executed this Limited Power of Attorney this __20__ day of _____April_____, 2015.

**Grantor: VM TRUST SERIES 3**
By: Wilmington Trust, National Association, not in its individual capacity, but solely as trustee

By: _____
Name: _Adam B. Scozzafava_____

Title: _Vice President_____

Witnessed by:

1. _____

2. _____

STATE OF <u>DELAWARE</u>   COUNTY OF <u>NEW CASTLE</u>

SUBSCRIBED and SWORN TO before me this _20th_ day of _April_____, 20_15_.

Notary Public _Christina M. Bader_

My Commission Expires: _04_ / _15_ / _2016_



CHRISTINA M BADER
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires 04-15-2016

EXHIBIT "A"



CERTIFIED TO BE A TRUE COPY

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE I MUST PAY.**

| May 25, 2006 | Vernon Rockville | CT |
|---|---|---|
| (Date) | (City) | (State) |

**352 Lake Street, Vernon Rockville, CT  06066**
(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 185,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is EquiFirst Corporation . I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of  7.750 %. The interest rate I will pay may change in accordance with Section 4 of the Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on  July 1, 2006

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If on  June 1, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**EquiFirst Corporation , 500 Forest Point Circle , Charlotte, NC 28273**
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,251.75 . This amount may change.    With a final payment due of $ 121,469.60 due on June 1, 2036.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on **June 1, 2008**, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **5.030** percentage points ( **5.030** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **10.750%** or less than **7.750** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.000%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **13.750%** or less than the initial interest rate provided for in Section 2 of this Note.

### (E) Effective Date of Change

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER RIGHT TO PREPAY

**(A) Prepayment**   I have the right to make payments at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**(B) Prepayment Penalty**

In the event, during the first 2 years after the execution of this Note, I make a prepayment and the prepayment exceeds twenty percent (20%) of the original principal amount of the loan in any twelve (12) month period, I will pay a prepayment charge in an amount equal to six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the loan within the twelve (12) month period. The Note Holder will not assess a prepayment penalty after the 2nd anniversary of the date of execution of this Note.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

EF815N
Loan Number: ██████        Page 3 of 4        Initials: SWG



## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred), without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**"WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED"**

_____ (Seal)          _____ (Seal)
Stephen W. Goulis          -Borrower          Eleanor C. Goulis          -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                     -Borrower

EF815N
Loan Number ██████          Page 4 of 4          Initials ____

## Balloon Payment Addendum to Note

This BALLOON PAYMENT ADDENDUM is made this **25th** day of **May, 2006** and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who sign below (the "Borrower(s) to **EquiFirst Corporation** (the "Lender") to secure repayment of a Note in the amount of U.S. $ **185,000.00**.

In addition to the agreements and provisions made in the Note and the Security Instrument, both the Borrower(s) and the Lender further agree as follows:

1) THIS LOAN IS PAYABLE IN FULL AT THE MATURITY DATE. THE "MATURITY DATE" IS June 1, 2036. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

2) **CALCULATION OF MONTHLY PAYMENT AT CHANGE DATE**
**THE SECOND PARAGRAPH OF SECTION 4(C) OF THE NOTE IS HEREBY AMENDED BY DELETING IT IN ITS ENTIRETY AND REPLACING IT WITH THE FOLLOWING:** "THE NOTE HOLDER WILL THEN DETERMINE THE AMOUNT OF THE MONTHLY PAYMENT THAT WOULD BE SUFFICIENT TO REPAY THE UNPAID PRINCIPAL BALANCE THAT I AM EXPECTED TO OWE AT THE CHANGE DATE IN FULL OVER THE REMAINING AMORTIZATION PERIOD OF MY LOAN AT MY NEW INTEREST RATE IN SUBSTANTIALLY EQUAL PAYMENTS. THE RESULT OF THIS CALCULATION WILL BE THE NEW AMOUNT OF MONTHLY PAYMENT. I UNDERSTAND THAT THE AMORTIZATION PERIOD OF MY LOAN IS 40 YEARS FROM THE DATE MY FIRST PAYMENT IS DUE AND THAT I WILL HAVE A FINAL BALLOON PAYMENT DUE ON THE MATURITY DATE."

3) AT LEAST NINETY (90), BUT NOT MORE THAN ONE HUNDRED TWENTY (120) DAYS PRIOR TO THE MATURITY DATE, THE LENDER MUST SEND THE BORROWER(S) A NOTICE WHICH STATES THE MATURITY DATE AND THE AMOUNT OF THE "BALLOON PAYMENT" WHICH WILL BE DUE ON THE MATURITY DATE (ASSUMING ALL SCHEDULED PAYMENTS DUE BETWEEN THE DATE OF THE NOTICE AND THE MATURITY DATE ARE MADE ON TIME).

_____   _____
Stephen W. Goulis           Eleanor C. Goulis

# Note Endorsements

Borrower(s): Stephen W. Goulis & Eleanor C. Goulis
Property Address: 352 Lake Street, Vernon Rockville, CT  06066

Without Recourse, Pay to the Order of:

## EMC MORTGAGE CORPORATION

EquiFirst Corporation

By: _____

Kyle Lilley

Assistant Vice President

*Stephanie Raymond*

EF5nendr (12/05)

Borrower Name: **GOULIS, STEPHEN**
Original Beneficiary:  **MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC., SOLELY AS
NOMINEE FOR EQUIFIRST CORPORATION**
Loan Amount: **185,000.00**
Dated Date: **MAY 25, 2006**
Property Address: **352 LAKE STREET, VERNON ROCKVILLE, CT 06066-0000**
Loan#: ███████  ████████████        ████████████

## ALLONGE TO NOTE

PAY TO THE ORDER OF:

Assignee:

(without recourse)

By:

Assignor: **EMC MORTGAGE CORPORATION**

By: _____

(Name,Title):

Seth M. Fenton
Vice President

## LOST NOTE AFFIDAVIT AND INDEMNIFICATION AGREEMENT

STATE OF *North Carolina*    )
            ) SS
COUNTY OF *Mecklenburg*   )

*Steve Neu*, being first duly sworn upon oath deposes and status:

That he/she is the *Director of Whole Loan Sales* of *Equifirst Corporation;*

That he/she is authorized by *Equifirst Corporation* (the "Seller") to execute this Lost Note Affidavit and Indemnification Agreement on behalf of the Seller. Notwithstanding anything contained herein, he/she shall have no personal liability pursuant to this Lost Note Affidavit and Indemnification Agreement.

That the Note, executed by **Stephen W. Goulis and Eleanor C. Goulis** in the original principal sum of **$185,000.00** payable to the order of *Equifirst Corporation* a copy of which is attached hereto as Exhibit A (the "Note") was lost and/or destroyed and neither the affiant herein nor, to the best of affiant's knowledge, any of the directors, officer, or employees of the Seller have any knowledge of the location or whereabouts of said Note and, to the best of affiant's knowledge, said Note has not been paid, satisfied, transferred, assigned, pledged, or hypothecated in any way.

NOW THEREFORE, for and in consideration of EMC Mortgage Corporation ("EMC") and its successors and/or assigns, accepting this Lost Note Affidavit and Indemnification Agreement along with a certified true copy of the Note attached and identified in Exhibit "A" in lieu of the original Note, the Seller does hereby agree to defend, indemnify and hold harmless EMC, its respective transferees, and their respective assigns, officers, directors, employees, agents, attorneys and representatives (collectively, the "Indemnified") from and against any and all loss or damage, together with all reasonable costs, charges and expenses (whether or not a lawsuit is filed) (collectively the "Loss") incurred by reason of any claim, demand, suit, cause of action or proceeding by a third party arising out of the Indemnified's inability to enforce the Note according to its terms or the inability to receive any related insurance proceeds due to the lack of an original Note by a third party. The Seller shall pay any such Loss upon demand provided that the Seller is notified of any such Loss in writing, within ten business days after the Indemnified becomes aware of same at the following address: *500 Forest Point Circle, Charlotte, NC 28273* Attention: *Steve Neu*, Director of Whole Loan Sales; with copy to *Equifirst Corporation, 500 Forest Point Circle, Charlotte, NC 28273*; Attention: Collateral Management; and further provided that the Seller is given full opportunity to direct or assist, at the Seller's option, the defense or settlement of any such Loss. The Seller does hereby further agree that should the original Note ever be found by it, it will promptly notify EMC and upon receipt by the Seller of the Note, will endorse to EMC, or its designee without recourse such original Note and promptly forward said Note to EMC or its designee. Upon receipt of the original Note by EMC this indemnification agreement shall become null and void as to any loss accruing subsequent to EMC's receipt of such original Note, however, the Seller shall remain liable as to any loss accruing on or prior to EMC's receipt of such original Note.

Executed this 15th day of February, 2007.

          Equifirst Corporation, a
          North Carolina Corporation

          By: _____
           Steve Neu, Vice President and
           Director of Whole Loan Sales

Subscribed and sworn to before me this 15th day of February, 2007.

_____
Notary Public

Loan No. ■■■■
Borrower: STEPHEN W GOULIS

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Modification"), is entered into and effective March 16, 2009, between STEPHEN W GOULIS AND ELEANOR C GOULIS ("Borrower", whether one or more), and EMC Mortgage Corporation ("EMC"), as servicer for EMC Mortgage Corporation ("Lender") current holder of the Note and Mortgage/Deed of Trust/Security Instrument or Retail Installment Contract (collectively referred to as the "Loan Agreement") dated May 25, 2006, in the amount of $ 185,000.00, covering property located at: 352 LAKE ST, VERNON ROCKVILLE, CONNECTICUT  6066 ("Property").

In consideration of the mutual promises and agreements exchanged, Borrower and Lender agree to amend and supplement the Loan Agreement as follows:

1. UNPAID PRINCIPAL BALANCE.  As of March 16, 2009, the unpaid principal balance under the Loan Agreement is $ 183,788.14.  Borrower agrees that additional amounts are owed for interest and expenses such as taxes, insurance premiums and other fees and costs totaling $ 24,049.57.  This amount is added to the unpaid principal balance.  The new unpaid principal balance is $ 207,837.71 ("Unpaid Principal Balance").

2. PROMISE TO PAY.  Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender.  Borrower shall send the monthly payments described herein to EMC Mortgage Corporation, Post Office Box 660753, Dallas, TX  75266-0753, or at such other place as Lender or EMC may designate in writing.

3. TERM.  The Note maturity date is June 1, 2036 ("Maturity Date").  If the Maturity Date is extended or reduced the Loan Agreement is likewise extended or reduced.  If on June 1, 2036, Borrower still owes amounts under the Loan Agreement or this Modification, Borrower will pay these amounts in full on the Maturity Date.

4. INTEREST RATE AND TEMPORARY INTEREST ONLY PAYMENT AMOUNT.  Interest will be charged on the Unpaid Principal Balance at the annual rate of 5.500% from March 1, 2009.  Borrower promises to pay monthly payments of interest only in the amount of $ 952.59 (this figure does not include escrow), beginning April 1, 2009, and on the same day of each month for the following 60 months.

Once the INTEREST ONLY PERIOD expires, the Lender will re-amortize the unpaid principal balance over the remaining term of this Modification to determine the current monthly principal and interest payment.  The Lender will notify the Borrower of the payment amount prior to the date that the monthly payment will change. I will pay this new payment amount from April 1, 2014 and on the same day of each month thereafter until the entire amount due and payable under the terms of the Loan Agreement and this Modification are paid in full.  All terms and provisions of the Loan Agreement (if any) providing for or relating to any change or adjustment in the payment amount, payment option or interest rate are cancelled.

BALLOON PAYMENT.  Borrower understands and agrees that the balloon payment as provided for in the Loan Agreement is hereby cancelled and the Loan Agreement is modified to provide for payments that will pay the loan in full by the end of the modified term once the Interest Only period expires.

5. ESCROW, TAXES, AND INSURANCE.  Borrower will comply with all other covenants, agreements, terms, conditions, and requirements of the Loan Agreement, including, without limitation, the Borrower's covenants and agreements to make all payments of property taxes, insurance premiums, assessments, escrow items, impounds and all other payments that Borrower is obligated to pay under the terms of the Loan Agreement.  In the event Borrower is not obligated under the terms of the Loan Agreement to make payments of property taxes, insurance premiums and/or escrow items, if applicable and in consideration for this Modification, Lender may require the Borrower to make additional monthly payments that include property taxes, insurance premiums and/or escrow items.

ESCROW SURPLUS.  After EMC applies the funds received from the Borrower, if any, and all modification adjustments are made to my loan, an escrow analysis will be performed to ensure the escrow amount is calculated correctly.  If this analysis results in an escrow surplus, Borrower agrees the surplus funds may be applied to the Unpaid Principal Balance reducing the principal balance of their loan.

6. INTEREST ACCRUAL.  If applicable, all terms and provisions of any reference to interest accrual methods commonly referred to as "daily simple interest" or "28 day interest" whether specified in the Loan Agreement or elsewhere, are cancelled.  Borrower agrees that the interest accrual method is changed to the actuarial method of interest accrual.

*(Page 1 of 2 Pages)*

Loan No: ███████                                    ████████████

7.  ALL OTHER TERMS REMAIN UNCHANGED.  Nothing in this Modification shall be understood or construed to be a satisfaction, or release in whole or in part of the Loan Agreement.  Except as expressly provided in this Modification, the Loan Agreement will remain unchanged and Borrower and Lender will be bound by, and comply with, all of the terms and provisions of the Loan Agreement, as amended by this Modification.

8.  MANUFACTURED HOMES.  For manufactured housing properties, Borrower agrees that the manufactured home has been affixed to the Property and will remain affixed throughout the term of the Loan Agreement and this Modification.  If your Loan Agreement does not include real property, the above statement does not apply.

9.  LOAN CHARGES.  Borrower understands that Lender may have charged fees to the Borrower for services performed in connection with Borrower's default, if applicable, protecting Lender's interest in the Property and/or rights under the Loan Agreement, including, but not limited to, attorneys' fees, property inspections and valuation fees.  Borrower understands and agrees that all or a portion of these fees may not be included in this Modification and remain due and owing by the Borrower.

**This Modification is in effect upon execution by Borrower.  If, however, corrections and/or amendments are needed for this Modification to correctly reflect the intent of all parties, Borrower agrees to sign documents evidencing the corrections and/or amendments and agrees to return the necessary document(s) to Lender or EMC in a timely manner.**

Date: 3-20-09

STEPHEN W GOULIS —Borrower

ELEANOR C GOULIS --Borrower

*(Page 2 of 2 Pages)*

After Recording Return To:
Acqura Loan Services c/o MRN3
3824 Cedar Springs Rd. #432, Dallas, TX 75219
Attn: Charles Weems
Tax/Map/Parcel ID No.

_____ [Space Above This Line For Recording Data] _____
Investor Loan No.:
Borrower: GOULIS

## MODIFICATION AGREEMENT

Borrower ("I"):  STEPHEN W GOULIS AND ELEANOR C GOULIS, HUSBAND AND WIFE
If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I." For purposes of this document
words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Lender or Servicer ("Lender"):  Acqura Loan Services  a Delaware  Corporation       for EMC Mortgage
LLC,

Date of first lien mortgage, deed of trust, or security deed ("Mortgage") recorded in Book or Liber Volume:
1835 Page: 0158, of the  Tolland County Recorder Records of TOLLAND County, CONNECTICUT and
Note ("Note"): May 25, 2006

Loan Number:
Property Address ("Property"):  352 LAKE ST, VERNON ROCKVILLE, CONNECTICUT 06066

   See Exhibit 'A' attached hereto and made a part hereof for all purposes.

If my representations in Section 1 continue to be true in all material respects, then this Modification
Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the
Property, and (2) the Note secured by the Mortgage.  The Mortgage and Note together, as they may
previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this
Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send
me a signed copy of this Agreement. If submitted electronically, please follow the agreed-upon e-process.

Loan Modification Agreement - Single Family- Modified Instrument
SigniaDocs, Inc. 2010

Make sure to keep a copy for your records. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations.**  I certify, represent to Lender and agree:

   A.   I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B.   Property Type:  Single Family.

   C.   There has been no change in the ownership of the Property since I signed the Loan Documents;

   D.   I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Modification program ("Program"));

   E.   Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F.   If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

   G.   I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2. **Acknowledgements and Preconditions to Modification.**  I understand and acknowledge that:

   A.   If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate.  In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   B.   I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.**  If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on September 1, 2012 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived.  I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect.  The first modified payment will be due on October 1, 2012.

   A.   The new Maturity Date will be: September 1, 2052.

Loan Modification Agreement - Single Family- Modified Instrument

SigniaDocs, Inc. 2010

B.      The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to Lender but not previously credited to my Loan. The new Principal balance of my Note will be $234,313.82 (the 'New Principal Balance'). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.      Interest at the rate of 5.5 % will begin to accrue on the New Principal Balance as of 9/1/2012 and the first new monthly payment on the New Principal Balance will be due on 10/1/2012. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly P&I Payment Amount | Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|----------------------------|-------------------------------|------------------------|-------------------|----------------------------|
| 1-40  | 5.500%        | 9/1/2012                  | $1,208.53                  | $405.76                       | $1,614.29              | 10/01/2012        | 480                        |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest- only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D.      I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.      If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

Loan Modification Agreement - Single Family- Modified Instrument
SigmaDocs, Inc. 2010

4.    **Additional Agreements**. I agree to the following:

A.    That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.    That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C.    To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.    Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items.

Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount.    Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of

Loan Modification Agreement - Single Family- Modified Instrument
SigniaDocs, Inc. 2010

current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E.    That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F.    That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.    That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.    That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Except as noted herein, this Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer of the Property.

Loan Modification Agreement - Single Family- Modified Instrument
SigniaDocs, Inc. 2010

I.   That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product (s), and/ or subordination agreement (s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/ or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement (s), title insurance product (s) and/ or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error.  If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Modification program.

L.   Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.  In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.   That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity.  In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury; (b) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan (s); and (c) any HUD certified housing counselor.

N.   I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary.  If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note.  All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents."  I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O.   That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment.

Loan Modification Agreement - Single Family- Modified Instrument
SigniaDocs, Inc. 2010

Furthermore, the date on which I may request cancellation of mortgage insurance may
change as a result of the New Principal Balance.

In Witness Whereof, the Lender and I have executed this Agreement.

EMC Mortgage, LLC By: Acqura Loan Services Its
Attorney in Fact

By: _____

Name: *Doug Battin*

Its: *Sr. Vice President*

Date: *9-7-12*

_____    Date: *9-4-12*
STEPHEN W GOULIS

_____    Date: *9/4/12*
ELEANOR C GOULIS

Loan Modification Agreement - Single Family- Modified Instrument
SigniaDocs, Inc. 2010

_____ [Space Below This Line For Acknowledgment] _____

State of CONNECTICUT
County of _TOLLAND_

On   this   the   _4th_   day   of   _September, 2012_____   , before   me,
_____ _Frannie Elderkin_____   , the  undersigned  officer,  personally
appeared STEPHEN W GOULIS and ELEANOR C GOULIS, husband and wife , known to me (or
satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

[Seal]

_Frannie Elderkin_____
Notary Public

FRANNIE ELDERKIN
NOTARY PUBLIC
MY COMMISSION EXPIRES OCT. 31, 2013
Printed Name

Date Commission Expires:   _10-31-13_____

Date: August 29, 2012
Loan Number:
Borrower: GOULIS

## COMPLIANCE AND CORRECTION AGREEMENT

Borrower(s): STEPHEN W GOULIS and ELEANOR C GOULIS

In consideration of Acqura Loan Services, a Delaware Corporation        for EMC Mortgage LLC,        ("Lender")
modifying certain loan terms pursuant to an agreement to effectuate the modification of the above referenced loan
("Loan") secured by the Property located at 352 LAKE ST, VERNON ROCKVILLE, CONNECTICUT 06066, the
undersigned ("Borrower" whether one or more) agrees, upon request of Lender, to (1) correct any inaccurate terms or
provisions in any and all of the documents executed or delivered in connection with the modified Loan; (2) execute,
acknowledge and/or initial such documentation as Lender deems necessary to replace and/ or correct any lost,
misplaced, omitted, misstated or inaccurate document; and (3) execute, acknowledge and/or initial such document(s) or
take such action as Lender reasonably may deem necessary or desirable to enable Lender to sell, convey, seek guaranty
or insurance for or market the modified Loan to any entity, including, without limitation, the Federal National
Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage
Corporation, the Federal Housing Authority, the Department of Veterans Affairs, or any state or municipal housing
authority.

The agreements contained herein shall apply whether the mistake or inaccuracy is due to a unilateral mistake on
the part of Lender or Borrower, a mutual mistake on the part of Lender and Borrower or a clerical error on the part of
any party to the transaction.

Borrower further agrees to comply with any request within 10 days of the date such request is made. Failure to
comply may invalidate the terms of the modified Loan. In addition, Borrower shall be liable for any and all losses or
damages sustained by Lender as a result of such failure, including, but not limited to, all attorney's fees and costs
incurred by Lender.

This agreement shall be binding on each Borrower, their heirs and assigns, and shall inure to the benefit of Lender,
its successors and assigns.


_____    Date: 9/4/12
STEPHEN W GOULIS


_____ Date: 9/4/12
ELEANOR C GOULIS

Return To:
EquiFirst Corporation
Attn: Collateral M
500 Forest Point Circle
Charlotte, NC 28273

Prepared By:
Quinlee Tomlin
500 Forest Point Circle
Charlotte, NC 28273



EXHIBIT "B"

---

[Space Above This Line For Recording Data]

## OPEN-END MORTGAGE DEED

MIN ████████████

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated May 25, 2006          ,
together with all Riders to this document.
(B) "Borrower" is Stephen W. Goulis and Eleanor C. Goulis, husband and wife

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

CONNECTICUT-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3007  1/01

-6A(CT) (0005)01
Page 1 of 14          Initials: _SWG_
VMP MORTGAGE FORMS - (800)521-7291

**(D) "Lender"** is EquiFirst Corporation

Lender is a **Corporation**
organized and existing under the laws of **North Carolina**
Lender's address is 500 Forest Point Circle, Charlotte, NC 28273

**(E) "Note"** means the promissory note signed by Borrower and dated **May 25, 2006**
The Note states that Borrower owes Lender **one hundred eighty-five thousand and 00/100**
Dollars
(U.S. $185,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **June 1, 2036**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | | | | |
|---|---|---|---|---|---|
| [x] | Adjustable Rate Rider | [ ] | Condominium Rider | [ ] | Second Home Rider |
| [x] | Balloon Rider | [ ] | Planned Unit Development Rider | [ ] | 1-4 Family Rider |
| [ ] | VA Rider | [ ] | Biweekly Payment Rider | [x] | Other(s) [specify] |
| | | | | | ARM Floor/ Prepay Rider |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **County** of **Tolland** :

        [Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]

**See Attached Exhibit A**

Parcel ID Number: ▆▆▆▆▆▆▆▆            which currently has the address of
**352 Lake Street**                                       [Street]
**Vernon Rockville**                [City] , Connecticut **06066**   [Zip Code]
("Property Address"):

    TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

▆▆▆▆▆▆▆

(NMLS) -6A(CT) (0005) 01                 Page 3 of 14       Initials _Sw6_          Form 3007  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

  

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien, in legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with





-6A(CT) (0005) 01                Page 6 of 14                Form 3007   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



-6A(CT) (0505).01    Page 7 of 14        Form 3007  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6A(CT) (0005) 01                              Page 8 of 14                              Form 3007    1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

  

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.





-6A(CT) (0005).01    Page 13 of 14    Initials    Form 3007   1/01

VOL 1 8 3 5 PG 1 1 0

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                _____ (Seal)
                                                        Stephen W. Goulis                -Borrower

_____                _____ (Seal)
                                                        Eleanor C. Goulis                -Borrower

_____ (Seal)                 _____ (Seal)
                              -Borrower                                                  -Borrower

_____ (Seal)                 _____ (Seal)
                              -Borrower                                                  -Borrower

_____ (Seal)                 _____ (Seal)
                              -Borrower                                                  -Borrower


STATE OF CONNECTICUT, _____Hartford_____ County ss: East Hartford
    The foregoing instrument was acknowledged before me this 25th day of May 2000
by Stephen W. Goulis & Eleanor C. Goulis


My Commission Expires:

_____                        _____
                                                        Notary Public

-6A(CT) (0005) 01                Page 14 of 14          VIRGINIA T. COPELAND    Form 3007  1/01
                                                        NOTARY PUBLIC
                                                        My Commission Expires August 31, 2003

POOR ORIGINAL
RECEIVED

a certain piece or parcel of land together with the buildings and improvements thereon, located in the Town of Vernon, County of Tolland and State of Connecticut, known as No. 952 Lake Street and abutting .87 acres of rear land more particularly described as follows:

Beginning at a point in the easterly line of Lake Street, said point marking the southeasterly corner of land now or formerly of Emil G. Stevens and the northwesterly corner of the herein described parcel; thence running easterly making an interior angle of 94 degrees 36 minutes, along land now or formerly of said Emil G. Stevens, a distance of five hundred twenty and three-tenths (520.3) feet to a point; thence turning and running southerly making an interior angle of 94 degrees 20 minutes, along land now or formerly of Manchester Water Company, a distance of thirty-five and eight-tenths 135.8) feet to a boundstone; thence continuing in a southerly direction along land now or formerly of said Manchester Water Company, a distance of sixty-four and two-tenths (64.2) feet to a point, which point is the southeasterly corner of the herein described parcel; thence turning and running in a westerly direction along land now or formerly of Ellen Bronkie and land now or formerly of John C. and Patricia L. Williams, partly by each, to a point in the easterly line of Lake Street; thence turning and running northerly making an interior angle 85 degrees 14 minutes, along Lake Street, a distance of one hundred (100) feet to the point and place of beginning.

Said premises are included on map entitled, "Property Survey For Frank Bronkie Lake Street Vernon, Conn. Scale 1" = 30'. Nov. 27, 1958 Haydon L. Griswold C.E.", which map is on file in the Town Clerk's Office in said Town of Vernon to which reference is hereby made.

## ADJUSTABLE RATE RIDER to Security Instrument

**(LIBOR 6 Month Index - As Published in *The Wall Street Journal* - Rate Caps)**

**(To Be Recorded Together with Security Instrument)**

THIS ADJUSTABLE RATE RIDER is made this   25th day of May , 2006   and incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to EquiFirst Corporation (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

352 Lake Street, Vernon Rockville, CT  06066

(property address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.**

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of  7.750 % .   The Note provides for changes in the interest rate  and the monthly payment as follows:

### (A) Change Dates

The interest rate I will pay may change on  June 1, 2008 and on that day every sixth month thereafter.  Each date on which my interest rate could change is called a "Change Date".

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*.   The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, The Note Holder will calculate my new interest rate by adding 5.030 percentage points (5.030 %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.750% or less than 7.750% .   Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) (1.00%) the rate of interest I have been paying for the preceding six months.  My interest rate will never be greater than 13.750 % or less than the initial interest rate provided for in Section 2 of this Note.

EF0611 (05/02)                    Page 1 of 2

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my new interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person), without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates to the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____
Stephen W. Goulis

_____
Eleanor C. Goulis

_____

_____

EF0612 (5/02)                Page 2 of 2

## Balloon Payment Rider to Security Instrument
### (To Be Recorded Together with Security Instrument)

This BALLOON PAYMENT RIDER (the "Rider") is made this 25th day of May, 2006 and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who sign below (the "Borrower(s)") to EquiFirst Corporation (the "Lender") to secure repayment of a Note in the amount of U.S. $ 185,000.00.

In addition to the agreements and provisions made in the Note and the Security Instrument, both the Borrower(s) and the Lender further agree as follows:

1) THIS LOAN IS PAYABLE IN FULL AT THE MATURITY DATE. THE "MATURITY DATE" IS June 1, 2036 YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

2) CALCULATION OF MONTHLY PAYMENT AT CHANGE DATE

THE SECOND PARAGRAPH OF SECTION 4(C) OF THE NOTE IS HEREBY AMENDED BY DELETING IT IN ITS ENTIRETY AND REPLACING IT WITH THE FOLLOWING: "THE NOTE HOLDER WILL THEN DETERMINE THE AMOUNT OF THE MONTHLY PAYMENT THAT WOULD BE SUFFICIENT TO REPAY THE UNPAID PRINCIPAL BALANCE THAT I AM EXPECTED TO OWE AT THE CHANGE DATE IN FULL OVER THE REMAINING AMORTIZATION PERIOD OF MY LOAN AT MY NEW INTEREST RATE IN SUBSTANTIALLY EQUAL PAYMENTS. THE RESULT OF THIS CALCULATION WILL BE THE NEW AMOUNT OF MONTHLY PAYMENT. I UNDERSTAND THAT THE AMORTIZATION PERIOD OF MY LOAN IS 40 YEARS FROM THE DATE MY FIRST PAYMENT IS DUE AND THAT I WILL HAVE A FINAL BALLOON PAYMENT DUE ON THE MATURITY DATE."

3) AT LEAST NINETY (90), BUT NOT MORE THAN ONE HUNDRED TWENTY (120) DAYS PRIOR TO THE MATURITY DATE, THE LENDER MUST SEND THE BORROWER(S) A NOTICE WHICH STATES THE MATURITY DATE AND THE AMOUNT OF THE "BALLOON PAYMENT" WHICH WILL BE DUE ON THE MATURITY DATE (ASSUMING ALL SCHEDULED PAYMENTS DUE BETWEEN THE DATE OF THE NOTICE AND THE MATURITY DATE ARE MADE ON TIME).

_____
Stephen W. Goulis

_____
Eleanor C. Goulis

_____

_____

_____

_____

EF033 (03/06)

## ADJUSTABLE RATE  INTEREST RATE FLOOR &
## PREPAYMENT PENALTY Rider to Security Instrument
### (To Be Recorded Together with Security Instrument)

This ADJUSTABLE INTEREST RATE FLOOR & PREPAYMENT PENALTY RIDER (the "Rider") is made this 25th day of May, 2006, and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who signs below (the "Borrower(s)") to EquiFirst Corporation (the "Lender") to secure prepayment of a Note in the amount of U.S.  $ 185,000.00.

In addition to the agreements and provisions made in the Note and the Security Instrument, and notwithstanding any provisions to the contrary contained in said Note or the Security Instrument, both the Borrower(s) and the Lender further agree as follows

### ADJUSTABLE INTEREST RATE FLOOR

This loan has an Interest Rate "Floor" which will limit the amount the Interest Rate can decrease.  Regardless of any changes in the Index, the Interest Rate during the term of this loan will never be less than the initial Interest Rate provided for in Section 2 of the Note.

### PREPAYMENT PENALTY

In the event, during the first  2 years after the execution of this Note, I make a prepayment and the prepayment exceeds twenty percent (20%) of the original principal amount of the loan in any twelve (12) month period, I will pay a prepayment charge in an amount equal to six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the loan within the twelve (12) month period. The Note Holder will not assess a  prepayment penalty after the 2nd anniversary of the date of execution of this Note.

_Stephen W. Goulis_
Stephen W. Goulis

_Eleanor C. Goulis_
Eleanor C. Goulis

EF058 (05/02)

RECORDED IN
VERNON LAND RECORDS
Bernice K. Dixon, VERNON TOWN CLERK
06/01/2006  03:14:18PM

VOL 1951 PG 3                                    **EXHIBIT "C"**

## ASSIGNMENT OF MORTGAGE

MIN ████████████                    LOAN NUMBER ████████████

KNOW YE THAT **Mortgage Electronic Registration Systems, Inc. as Nominee for EquiFirst Corporation**, ("Assignor"), having an office and place of business at 3300 SW 34th Avenue, Suite 101, Ocala, FL 34474 for the consideration of One Dollar and other valuable considerations, does hereby assign to **EMC Mortgage Corporation**, ("Assignee"), a Texas corporation, having an address of 909 Hidden Ridge Drive, Suite 200, Irving, TX 75038, its successors, and assigns forever, all the right, title, interest, claim, and demand whatsoever as the said Assignor has or ought to have in or to a certain mortgage from Stephen W Goulis and Eleanor C Goulis to Mortgage Electronic Registration Systems, Inc As Nominee for EquiFirst Corporation dated May 25, 2006 and recorded on June 01, 2006 in Volume 1835 at Page 158 of the Vernon Land Records, in or to the property described in said mortgage deed situated in the Town of Vernon, County of Tolland and State of Connecticut, without warranty or representation by, or recourse to, said Assignor

TO HAVE AND TO HOLD the premises, with all the appurtenances, unto the said Assignee, its successors and assigns forever, so that neither the Assignor nor its successors, nor any other person under it or them shall hereafter have any claim, right or title in or to the premises, or any part thereof, but therefrom it is and they are by these presents forever barred and secluded

IN WITNESS WHEREOF, on the _21_ day of _August_, 2007, said corporation has caused this deed to be executed and delivered, and its corporate seal to be hereto affixed in its behalf by _Liquenda Allotey_, who is duly authorized and empowered

Signed, sealed and delivered                 MORTGAGE ELECTRONIC
In the presence of                            REGISTRATION SYSTEMS, INC AS
                                              NOMINEE FOR EQUIFIRST
                                              CORPORATION

_M Mokic_                                     By _____

                                              Its _Liquenda Allotey_ VP

STATE OF _MN_

COUNTY OF _Dakota_        ss

On this _21_ day of _August_, 2007, before me personally came _Liquenda Allotey_ to me known, who being by me duly sworn, did depose and say that he/she is a _VP_ of _EMC Mortgage Co._, which executed the above instrument that he/she knows the seal of said corporation that the seal affixed to said instrument is such corporate seal, that it was so affixed by order of the Board of Directors of said corporation, and that he/she signed his/her name thereto by means of electronic process by like order acknowledged

_____
Notary Public
My Commission Expires _1/31/11_

```
Matthew Allan Banaszewski
NOTARY PUBLIC MINNESOTA
MY COMMISSION
EXPIRES JAN 31, 2011
```

RECORDED IN
VERNON LAND RECORDS
Bernice K. Dixon
VERNON TOWN CLERK
ON Sep 13,2007 AT 12:18P

**PROPERTY**
352 Lake Street
Vernon, CT 06066
Stephen W Goulis
████████████

Recording Requested By:

Avenue 365 Lender Services, LLC
401 Plymouth Road
Suite 550
Plymouth Meeting, PA 19462



_____ Space above for Recorder's use _____

## ASSIGNMENT OF MORTGAGE  *EMC Mortgage LLC f/k/a*

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **EMC MORTGAGE CORPORATION, 909 HIDDEN RIDGE DRIVE SUITE 200, IRVING, TX 75038-0000**, by these presents does convey, grant, bargain, sell, assign, transfer and set over to: **WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR VM TRUST SERIES 3, A DELAWARE STATUTORY TRUST, 1100 NORTH MARKET STREET, WILMINGTON, DE 19890-0000**, the described Mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$185,000.00** is recorded in the State of **CONNECTICUT**, Township of **VERNON**, County of **TOLLAND** dated **MAY 25, 2006** and recorded on **JUNE 01, 2006, as Instrument No. 002869, in Book No. 1835, at Page No. 158.**
Original Mortgagor: **STEPHEN W. GOULIS AND ELEANOR C. GOULIS, HUSBAND AND WIFE.**
Original Mortgagee: **MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC., SOLELY AS NOMINEE FOR EQUIFIRST CORPORATION.**
Date: _____1/7/15_____
**EMC MORTGAGE ~~CORPORATION~~ LLC f/k/a EMC Mortgage Corporation**

By: _____      Seth M. Fenton
    (Name,Title): _____      ~~Vice President~~

WITNESS:

____Chloe McKenzie____
(Name): Chloe McKenzie

(Name): _JUSTICE K. ASANTE_

State of ____New York____ }
County of ____New York____ } ss.

On _January 7, 2015_, before me, _Migdalia Dereyayla_, a Notary Public, personally appeared _Seth Fenton_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
Witness my hand and official seal.

_Migdalia Dereyayla_
(Notary Name):
My commission expires: _____

MIGDALIA DEREYAYLA
Notary Public, State of New York
Registration # 01DE6072408
Qualified in Kings County
Commission Expires: April 1, 2018

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Stephen W. Goulis** |
| | First Name — Middle Name — Last Name |
| Debtor 2 | **Eleanor C. Goulis** |
| (Spouse if, filing) | First Name — Middle Name — Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF CONNECTICUT |
| Case number (if known) | _____ |

EXHIBIT "D"

☐ Check if this is an amended filing

<u>Official Form 106D</u>
# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1:    List All Secured Claims**

**2. List all secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral. | Column B<br>**Value of collateral that supports this claim** | Column C<br>**Unsecured portion**<br>If any |
|---|---|---|---|---|
| **2.1** **Shellpoint Mortgage Servicing**<br>Creditor's Name<br><br>**55 Beattie Place, Suite 110**<br>**Greenville, SC 29601**<br>Number, Street, City, State & Zip Code | **Describe the property that secures the claim:**<br>**352 Lake Street Vernon Rockville, CT 06066  Tolland County**<br><br>As of the date you file, the claim is: Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $234,313.82 | $190,080.00 | $44,233.82 |
| **Who owes the debt?** Check one.<br>☐ Debtor 1 only<br>☐ Debtor 2 only<br>■ Debtor 1 and Debtor 2 only<br>☐ At least one of the debtors and another<br>☐ Check if this claim relates to a community debt | **Nature of lien.** Check all that apply.<br>☐ An agreement you made (such as mortgage or secured car loan)<br>☐ Statutory lien (such as tax lien, mechanic's lien)<br>☐ Judgment lien from a lawsuit<br>■ Other (including a right to offset)    **Mortgage** | | | |
| Date debt was incurred    **6/1/2006** | Last 4 digits of account number    _____ | | | |
| **2.2** **Town of Vernon**<br>Creditor's Name<br><br>**14 Park Place, #2**<br>**Vernon Rockville, CT 06066**<br>Number, Street, City, State & Zip Code | **Describe the property that secures the claim:**<br>**352 Lake Street Vernon Rockville, CT 06066  Tolland County**<br><br>As of the date you file, the claim is: Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $281.56 | $190,080.00 | $281.56 |
| **Who owes the debt?** Check one.<br>☐ Debtor 1 only<br>☐ Debtor 2 only<br>■ Debtor 1 and Debtor 2 only<br>☐ At least one of the debtors and another<br>☐ Check if this claim relates to a community debt | **Nature of lien.** Check all that apply.<br>☐ An agreement you made (such as mortgage or secured car loan)<br>☐ Statutory lien (such as tax lien, mechanic's lien)<br>☐ Judgment lien from a lawsuit<br>■ Other (including a right to offset)    **Sewer Lien** | | | |
| Date debt was incurred    _____ | Last 4 digits of account number    _____ | | | |

| Debtor 1 | **Stephen W. Goulis** | | | Case number (if know) | |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |
| Debtor 2 | **Eleanor C. Goulis** | | | | |
| | First Name | Middle Name | Last Name | | |

| | |
|---|---|
| Add the dollar value of your entries in Column A on this page. Write that number here: | $234,595.38 |
| If this is the last page of your form, add the dollar value totals from all pages. Write that number here: | $234,595.38 |

**Part 2:    List Others to Be Notified for a Debt That You Already Listed**

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

☐ Name Address
**Shechtman Halperin Savage, LLP**
**1080 Main Street**
**Pawtucket, RI 02860**

On which line in Part 1 did you enter the creditor?    **2.1**

Last 4 digits of account number

☐ Name Address
**Wilmington Trust, National Association**
**1100 North Market Street**
**Wilmington, DE 19890**

On which line in Part 1 did you enter the creditor?    **2.1**

Last 4 digits of account number

---

Official Form 106D    Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**    page 2 of 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT (HARTFORD)

| | |
|---|---|
| IN RE:<br><br>STEPHEN W. GOULIS,<br>ELEANOR C. GOULIS,<br>  DEBTORS | BK No.:  16-20246-JJT<br><br><br>Chapter 13 |

| |
|---|
| WILMINGTON TRUST, NATIONAL<br>ASSOCIATION, NOT IN ITS INDIVIDUAL<br>CAPACITY, BUT SOLELY AS TRUSTEE<br>FOR VM TRUST SERIES 3, A DELAWARE<br>STATUTORY TRUST, MOVANT<br><br>vs.<br><br>STEPHEN W. GOULIS,<br>ELEANOR C. GOULIS,<br>  DEBTORS<br><br>&<br><br>MOLLY T. WHITON, ESQ., TRUSTEE<br><br>RESPONDENTS |

<u>NOTICE OF CONTESTED MATTER RESPONSE DATE</u>

Wilmington Trust, National Association, Not in its Individual Capacity, but

Solely as Trustee for VM Trust Series 3, a Delaware Statutory Trust (the "Movant")

has filed a Motion for Relief from Automatic Stay, (the "Contested Matter") with the

U.S. Bankruptcy Court.  Notice is hereby given that any response to the Contested

Matter must be filed with the Court no later than <u>July 19, 2017</u> in accordance with

Federal Rules of Bankruptcy Procedure 2002(a) and 9014.* In the absence of a timely

filed response, the proposed order in the Contested Matter *may* enter without further

notice and hearing, *see,* 11 U.S.C. § 102(1).

*Pursuant to Federal Rule of Bankruptcy Procedure 9006(f), if service is made by mail, three days are added after the response date set in this notice.

Dated: <u>July 5, 2017</u>                    Wilmington Trust, National Association, Not in its
                                              Individual Capacity, but Solely as Trustee for VM
                                              Trust Series 3, a Delaware Statutory Trust,
                                              By Its Attorney


                                              <u>/s/ Jeffrey J. Hardiman</u>
                                              Jeffrey J. Hardiman, Esq.
                                              Bar #24355
                                              Shechtman Halperin Savage, LLP
                                              1080 Main Street
                                              Pawtucket, RI 02860
                                              (401) 272-1400 phone
                                              (401) 272-1403 fax
                                              jhardiman@shslawfirm.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT (HARTFORD)

IN RE:

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
   DEBTORS

BK No.:  16-20246-JJT


Chapter 13

WILMINGTON TRUST, NATIONAL
ASSOCIATION, NOT IN ITS INDIVIDUAL
CAPACITY, BUT SOLELY AS TRUSTEE
FOR VM TRUST SERIES 3, A DELAWARE
STATUTORY TRUST, MOVANT

vs.

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
   DEBTORS

&

MOLLY T. WHITON, ESQ., TRUSTEE

RESPONDENTS

PROPOSED ORDER GRANTING
MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Following notice and a hearing, see Bankruptcy Code Section 102(1)(A), on

Wilmington Trust, National Association, Not in its Individual Capacity, but Solely as

Trustee for VM Trust Series 3, a Delaware Statutory Trust (hereafter, the "Movant")

Motion for Relief from Stay (hereafter, the "Motion"), Doc. I. D. No. ___,

**IT IS HEREBY ORDERED** that the Motion is **GRANTED** –  the automatic

stay of 11 U.S.C. § 362(a) is hereby modified pursuant to 11 U.S.C. § 362(d) to permit

the Movant, and/or its successors and assigns, to commence, continue and prosecute to

judgment a  foreclosure action and otherwise  exercise its rights, if any, with respect to

real property known as 352 Lake Street, Vernon Rockville, CT 06066 in accordance with

applicable state law, and

**IT IS FURTHER ORDERED** that fourteen-day stay afforded by Fed. R. Bankr.

P. 4001(a)(3) is not applicable and the Movant may immediately enforce and implement

this Order.


Dated:_____            _____

                                  Judge James J. Tancredi
                                  U.S. Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT (HARTFORD)

IN RE:

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
  DEBTORS

BK No.:  16-20246-JJT

Chapter 13

WILMINGTON TRUST, NATIONAL
ASSOCIATION, NOT IN ITS INDIVIDUAL
CAPACITY, BUT SOLELY AS TRUSTEE
FOR VM TRUST SERIES 3, A DELAWARE
STATUTORY TRUST, MOVANT

vs.

STEPHEN W. GOULIS,
ELEANOR C. GOULIS,
  DEBTORS

&

MOLLY T. WHITON, ESQ., TRUSTEE

RESPONDENTS

<u>CERTIFICATE OF SERVICE</u>

In accordance with the applicable provisions of the Federal Rules of Bankruptcy

Procedure, 2002, and 7004, the undersigned certifies that on the 5th day of July, 2017,

the following documents were served on the U.S. Trustee and all appearing parties via

the court's electronic filing system and by first class mail on the parties listed below:

1. **<u>Documents  Served</u>:**

    1.      Motion for Relief from Automatic Stay

    2.      Affidavit in Support of Motion

3.      Proposed Order

4.      Notice of Contested Matter

**2.    Parties  Served:**

VIA ELECTRONIC NOTICE:

U. S. Trustee
Office of the U.S. Trustee
Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510
USTPRegion02.NH.ECF@USDOJ.GOV
*(U.S. Trustee)*

Molly T. Whiton
10 Columbus Boulevard
Hartford, CT 06106
mtwhiton@mtwhiton.com
*(Trustee)*

Joel M. Grafstein
Grafstein & Arcaro
10 Melrose Drive
Farmington, CT 06032
jgrafstein@grafsteinlaw.com
*(Attorney for Debtor)*

VIA FIRST CLASS MAIL

Stephen W. Goulis
352 Lake Street
Vernon Rockville, CT 06066
*(Debtor)*

Eleanor C. Goulis
352 Lake Street
Vernon Rockville, CT 06066
*(Joint Debtor)*

Town of Vernon
Attn: Terry Hjarne (Collector of Revenue)
8 Park Place

Vernon-Rockville, CT 06066
*(Tax Collector)*

Town of Vernon
Attn: Sewer Dept.
14 Park Place, #2
Vernon Rockville, CT 06066
*(Creditor)*

/s/ Jeffrey J. Hardiman